1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS T. HAWKER, et al., | Case No.  1:12-cv-01261-SAB |
| Plaintiffs, | ORDER GRANTING BANCINSURE'S MOTION FOR SUMMARY JUDGMENT AND DENYING THE FDIC'S MOTION FOR SUMMARY JUDGMENT |
| v. | |
| BANCINSURANCE, INC., et al., | ECF NO. 74, 76, 105 |
| Defendants. | |

On January 31, 2014, Plaintiff Federal Deposit Insurance Corporation ("FDIC") and Defendant BancInsure, Inc. ("BancInsure") filed cross motions for summary judgment.  (ECF Nos. 74, 76.)  On March 7, 2014, BancInsure filed a motion to strike certain evidence from the record.  (ECF Nos. 101, 105.)  All parties have consented to the jurisdiction of a United States Magistrate Judge for all purposes.  (ECF Nos. 41, 42, 43.)

The hearing on the motions took place on Wednesday, April 2, 2014.  Patrick Richard appeared on behalf of the FDIC and Edward Donohue appeared on behalf of BancInsure.  For the reasons set forth below the Court finds that BancInsure's motion for summary judgment should be granted and the FDIC's motion for summary judgment should be denied.

/ / /

/ / /

/ / /

1

# I.

# BACKGROUND

This action was filed on August 1, 2012. (ECF No. 1.) Plaintiffs Thomas T. Hawker John J. Incandela, Dave Kraechan, Edwin Jay Lee, and Edward Rocha ("the County Bank Officers") filed suit against BancInsure for the alleged wrongful denial of insurance coverage. The County Bank Officers are all former officers of County Bank, a California state-chartered bank. The County Bank Officers were named as defendants in a civil action filed by FDIC ("the Civil Action"), who alleged that the County Bank Officers were negligent and breached their fiduciary duties to County Bank. The County Bank Officers contend that the insurance policy covers civil actions brought by the FDIC whereas BancInsure contends that the insurance policy does not cover civil actions brought by the FDIC due to an Insured versus Insured Exclusion in the policy. The parties now seek partial summary judgment on certain issues pertaining to the proper interpretation of the insurance policy.

### A. Undisputed Material Facts

County Bank is a state-chartered bank headquartered in Merced, California with branches throughout the central valley of California. (Response of BancInsure, Inc. to Separate Statement of Undisputed Facts of FDIC-R ("FDIC-R SSUF") ¶ 1.) County Bank is wholly owned by a holding company, Capital Corporation of the West ("Capital Corp."). (FDIC-R SSUF ¶ 2.)

BancInsured issued Capital Corp./County Bank the Extended Professional Liability Insurance Policy No. PLI 00016 ("the EPL Policy") with a term from January 19, 2008 through January 19, 2011. (FDIC-R SSUF ¶ 22.) With respect to the scope of coverage, the EPL Policy stated:

> Executive Liability
> A.    The Insurer will pay on behalf of an insured person, loss that is a result of a claim for a management practices wrongful act first made during the policy period or during the extended reporting period, if exercised, except to the extent that the company has indemnified the insured person for such loss.

(FDIC-R SSUF ¶ 22, 34.)

///

1  The EPL Policy defined "Insured Person" as:

2  P.     Insured person means any person who was, now is or shall
   be a director, officer, trustee, appointed member of an advisory
3  board or committee, volunteer, organizer or employee of the
   company.

4

5  (FDIC-R SSUF ¶ 22, 35.)  The County Bank Officers qualify as "Insured Persons" within the

6  meaning of the EPL Policy as former officers of County Bank and Capital Corp.  (FDIC-R SSUF

7  ¶ 22, 36.)

8  The EPL Policy contains the following exclusion, referred to as "Exclusion 21":

9  21.     a claim by, or on behalf of, or at the behest of, any other
   insured person, the company, or any successor, trustee, assignee or
10 receiver of the company except for:
   a.     a shareholder's derivative action brought on behalf of the
11 company by one or more shareholders who are not insured persons
   and make a claim without the cooperation or solicitation of any
12 insured person or the company;
   b.     an employment practices wrongful act, an electronic
13 banking wrongful act or an electronic publishing wrongful act
   brought by an insured person; or
14 c.     a claim brought by an insured person for a management
   practices wrongful act in his or her capacity as a customer or client
15 other than as a borrower of the company.

16 (FDIC-R SSUF ¶ 22; Response of the FDIC as Receiver for County Bank to Def. BancInsure,

17 Inc.'s SSUF in Supp. of Mot. for Summ. Adj., and Add'l Material Facts in Opp'n ("BancInsure

18 SSUF") ¶ 8.)

19 On February 6, 2009, the California Department of Financial Institutions closed County

20 Bank and the FDIC was appointed as receiver.  (FDIC-R SSUF ¶ 4; BancInsure SSUF ¶ 20.)

21 The FDIC's potential claims against the County Bank Officers were first made and

22 reported to BancInsure on February 5, 2009.  (FDIC-R SSUF ¶ 47.)  The FDIC made a formal

23 claim to BancInsure on November 16, 2009.  (FDIC-R SSUF ¶ 48.)  On December 8, 2009,

24 BancInsure responded to the FDIC's claim and cited Exclusion 21 as a basis to deny the claim

25 because the FDIC is the receiver of County Bank.  (BancInsure SSUF ¶ 22.)

26 On January 27, 2012, the FDIC filed the Civil Action against the County Bank Officer in

27 this Court, in the case FDIC v. Hawker, Case No. 12-00127-SAB.  (FDIC-R SSUF ¶ 51.)  On

28 January 30, 2012, the County Bank Officers tendered to BancInsure seeking all relevant

1  insurance benefits including advancement of defense costs.  (BancInsure SSUF ¶ 13.)  On

2  November 8, 2012, the FDIC and the County Bank Officers reached a settlement in the Civil

3  Action whereby the County Bank Officers assigned all their claims against BancInsure to the

4  FDIC and consented to an entry of default judgment against them.  (FDIC-R SSUF ¶ 56.)

5  Default judgment was entered against the County Bank Officers in the Civil Action in the

6  amount of $48,545,060.  (FDIC-R SSUF ¶ 57.)

7        **B.**     **Phase I Scheduling**

8        On August 29, 2013, the Court issued a Second Amended Scheduling Order.  (ECF No.

9  50.)  Discovery and motion practice was scheduled to occur in separate phases.  Phase I was

10 limited to discovery and motions limited to the issue of "[w]hether exclusion 21 of the [EPL]

11 Policy bars coverage for loss arising out of the FDIC Action."  (Second Am. Sched. Order 3:7-

12 21, ECF No. 50.)  Accordingly, the motions for summary judgment filed by the parties are

13 limited to addressing this issue.

14                                   **II.**

15               **LEGAL STANDARDS FOR SUMMARY JUDGMENT**

16       Under Federal Rule of Civil Procedure 56, "[a] party may move for summary judgment ...

17 if the movant shows that there is no genuine dispute as to any material fact and the movant is

18 entitled to judgment as a matter of law."  Summary judgment must be entered "against a party

19 who fails to make a showing sufficient to establish the existence of an element essential to that

20 party's case..."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  "[A] party seeking summary

21 judgment always bears the initial responsibility of informing the district court of the basis for its

22 motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories,

23 and admissions on file, together with the affidavits, if any,' which it believes demonstrate the

24 absence of a genuine issue of material fact."  <u>Id.</u>

25 ///

26 ///

27 ///

28 ///

## III.

## DISCUSSION

**A.     Proper Interpretation of Exception 21 of the EPL Policy**

The parties seek summary adjudication on the issue of the proper interpretation of Exception 21 of the EPL Policy.  The FDIC contends that Exception 21 does not exclude claims brought by the FDIC against the County Bank Officers because the FDIC is not a "receiver" within the meaning of the EPL Policy.  BancInsure contends that Exception 21 excludes claims by the FDIC because the FDIC was appointed as "receiver" for County Bank.

Under California law, "[i]nterpretation of an insurance policy is a question of law and follows the general rules of contract interpretation." MackKinnon v. Truck Ins. Exchange, 31 Cal. 4th 635, 647 (2003) (citing Waller v. Truck Ins. Exchange, Inc., 11 Cal. 4th 1, 18 (1995)). Moreover:

> "The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual intention' of the parties.  'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation.  (Civ.Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract.  (Id., § 1639.)  The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" (id., § 1644), controls judicial interpretation.  (Id., § 1638.)' [Citations.]  A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable.  [Citation.] But language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract."  (Id. at p. 18, 44 Cal.Rptr.2d 370, 900 P.2d 619.)

Id. at 647-48.

Although interpretation of an insurance policy follows the general rules of contract interpretation, California law provides for particular principles which apply in the insurance context.  Insurance coverage is interpreted broadly so as to afford the greatest possible protection to the insured and exclusionary clauses are interpreted narrowly against the insurer.  MacKinnon, 31 Cal. 4th at 648 (quoting White v. Western Title Ins. Co., 40 Cal. 3d 870, 881 (1985)).

/ / /

1
2
3
4
5

> "[A]n insurer cannot escape its basic duty to insure by means of an exclusionary clause that is unclear.  As we have declared time and again 'any exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect.'  [Citation.]  Thus, 'the burden rests upon the insurer to phrase exceptions and exclusions in clear and unmistakable language.'  [Citation.]  The exclusionary clause 'must be *conspicuous*, *plain* and *clear*.'"

6
7

Id. (quoting State Farm Mut. Auto. Ins. Co. v. Jacober, 10 Cal.3d 193, 201-202 (1973)) (italics in original).

8
9
10
11
12
13
14
15
16
17

In determining whether a provision of the insurance contract is ambiguous, the Court looks at not only the face of the contract but also any extrinsic evidence that supports a reasonable interpretation.  Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co., 69 Cal. 2d 33, 39-40 (1968); London Market Insurers v. Superior Court, 146 Cal. App. 4th 648, 656 (2007).  To the extent contract interpretation involves parol evidence, the evidence is admissible as follows: First the court provisionally receives all credible evidence concerning the parties' intent to determine whether the language is "reasonable susceptible" to the interpretation urged by a party.  Hervey v. Mercury Cas. Co., 185 Cal. App. 4th 954, 961-62 (2010).  If the court determines that the language is "reasonably susceptible" to the interpretation urged, the extrinsic evidence is admitted to aid in interpreting the contract.  Id. at 962.

18
19
20
21
22

The parties dispute whether the FDIC is a "receiver" within the EPL Policy.  However, there is no dispute that the FDIC was appointed as a receiver of County Bank after it failed.  (FDIC-R SSUF ¶ 4; BancInsure SSUF ¶ 20.)  Instead, the FDIC contends that the term "receiver," within the meaning of Exception 21 in the EPL Policy, refers to a type of court appointed receiver, not to the FDIC.

23

1.    Dictionary Definition of "Receiver"

24
25
26

As noted by the FDIC, the term "receiver" is not defined in the EPL Policy.  Accordingly, the Court must interpret the term "receiver" in its "ordinary and popular" sense.  See MacKinnon, 31 Cal. 4th at 647-48.  Black's Law Dictionary defines "receiver" as:

27
28

> A disinterested person appointed by a court, or by a corporation or other person, for the protection or collection of property that is the subject of diverse claims (for example, because it belongs to a

6

bankrupt or is otherwise being litigated).

Black's Law Dictionary 1383 (9th ed. 2009).

Merriam-Webster provides the following definition of receiver:

> ...
> **2**: one that receivers on behalf of others: as **a**: a person appointed to receiver money due : treasurer **b** (1): a person appointed usu. by a court of equity jurisdiction to receive and conserve property that is the subject of litigation, to administer it under supervision of the court as its agent, and to apply, manage, and dispose of it in accordance with the orders and decrees of the court until the final determination of the litigation (2): a person appointed under a statute by an administrative public officer to wind up the affairs of a business (as a bank, railroad, or insurance company) involving a public interest in case of dissolution or insolvency or to manage under the direction of a court a corporation financially embarrassed during a period of reorganization in an effort to avoid bankruptcy
> ...

Webster's Third New International Dictionary of the English Language, Unabridged 1894 (2002).   The definitions provided by Black's Law Dictionary and Webster's Dictionary are consistent with BancInsure's position that the FDIC qualifies as a "receiver" in the ordinary and popular sense.

The FDIC argues that the term "receiver," as used in the EPL Policy, was intended to refer to the type of court appointed receiver rather than an entity such as the FDIC, which is appointed by non-court entities.  See 12 U.S.C. § 1821(c).  The FDIC cites some dictionaries which define "receiver" as someone appointed by a court.  Thus, following these definitions, the FDIC is not a "receiver" in the ordinary and popular sense because it is not appointed by a court.

However, neither Black's Law Dictionary nor Webster's Third New International Dictionary make much distinction between a receiver that is appointed by a court versus one which is not.  Moreover, as recognized by the California Supreme Court, a basic fallacy in policy interpretation is the "the conclusion that the meaning of policy language is to be discovered by citing one of the dictionary meanings of key words...."  MacKinnon, 31 Cal. 4th at 649. "Although examination of various dictionary definitions of a word will no doubt be useful, such examination does not necessarily yield the 'ordinary and popular' sense of the word if it disregards the policy's context."  Id. (citing Bank of the West v. Superior Court, 2 Cal. 4th 1254,

1  1265 (1992)).  Instead, the Court "must attempt to put itself in the position of a layperson and

2  understand how he or she might reasonably interpret the exclusionary language." Id. (citing AIU

3  Ins. Co. v. Superior Court, 51 Cal. 3d 807, 822 (1990)).

4        Given the context and the fact that the term "receiver" was used in its legal sense, the

5  Court finds that the definition provided in Black's Law Dictionary is more representative of the

6  "ordinary and popular" meaning of "receiver."  The Black's Law Dictionary expressly does not

7  limit the definition to court-appointed receivers.  The Court is not persuaded that the court-

8  appointed characteristic is in any way central to the definition of "receiver," given the similarity

9  in role between the FDIC as a receiver and any other type of legal receiver.

10       The FDIC meets the "ordinary and popular" definition of receiver.  The FDIC does not

11 dispute that the FDIC, in its capacity as receiver for County Bank, performs the characteristic

12 functions of a "receiver" as defined in Black's Law Dictionary.  The FDIC acts to protect or

13 collect the assets of County Bank, which are subject to diverse claims from stockholders,

14 creditors, depositors, etc.  While the FDIC attempts to differentiate itself from other types of

15 receivers, it fails to identify any significant distinction that would justify an interpretation of

16 Exclusion 21 that would treat the FDIC differently from any other type of receiver.  Accordingly,

17 the Court finds that the ordinary and popular definition of a receiver supports the conclusion that

18 claims brought by the FDIC in its capacity as receiver for County Bank are excluded by

19 Exclusion 21 of the EPL Policy.

20            2.    Existence of Separate Regulatory Exclusion

21       The FDIC argues that the intent to exclude the FDIC from the exclusionary effect of

22 Exclusion 21 is evidenced by the fact that BancInsure offered a separate "Regulatory Exclusion"

23 with language that specifically barred claims asserted by the FDIC.  The FDIC contends that,

24 prior to the current EPL Policy, County Bank was covered by a directors' and officers' insurance

25 policy that included both an insured versus insured exclusion as well as a separate regulatory

26 exclusion.  The regulatory exclusion stated:

27                 Section V. Exclusions.
                  The Insurer shall not be liable to make any payment for Loss in
28                connection with any Claim made against the Insured Persons based

> upon, arising out of, relating to, in consequence of, or in any way involving:
>
> ...
>
> any action or proceeding brought by or on behalf of any federal or state regulatory or supervisory agency or deposit insurance organization ("Agency").
>
> This exclusion shall include, but not be limited to, any type of legal action which any such Agency may bring as receiver, conservator, trustee, liquidator, rehabilitator or in any capacity, whether such action or proceeding is brought in the name of such Agency or by or on behalf of such Agency in the name of any other entity or solely in the name of any third party;

(Decl. of James H. Vorhis in Supp. of Mot. for Partial Summ. J. Ex. A, at pp. 15-16, ECF No. 83.1.)

The FDIC argues that the regulatory exclusion was intended to exclude claims brought by the FDIC. The FDIC argues that the existence of two separate exclusions demonstrates that the regulatory exclusion was intended to exclude FDIC claims and the insured versus insured exclusion was not intended to exclude FDIC claims. The FDIC contends that the regulatory exclusion would be superfluous if claims brought by the FDIC were already barred by the insured versus insured exclusion.

However, the FDIC's argument fails to acknowledge the "FDIC's dual capacity as federal insurer of deposits and as liquidating agent for the bank." Federal Deposit Ins. Corp. v. Glickman, 450 F.2d 416, 418 (9th Cir. 1971); see also Bullion Services, Inc. v. Valley State Bank, 50 F.3d 705, 709 (9th Cir. 1995) ("Because FDIC Corporate and FDIC Receiver perform two different functions and protect wholly different interests, courts have been careful to keep the rights and liabilities of these two entities legally separate."). The FDIC "stands in the shoes of the insolvent bank" *only* in the latter capacity. Id. Thus, the existence of a regulatory exclusion is not superfluous in light of the insured versus insured exclusion: the regulatory exclusion would bar suits brought by the FDIC in its capacity as federal insurer, also known as its "corporate capacity," whereas the insured versus insured exclusion would only bar claims by the FDIC in its capacity as a receiver. See Mt. Hawley Ins. Co. v. Federal Sav. & Loan Ins. Corp., 695 F. Supp. 469, 482 (C.D. Cal. 1987) (existence of regulatory endorsement does not evidence intent that insured versus insured endorsement did not apply to regulatory agencies

1  such as the FSLIC).

2       The FDIC further argues that the regulatory exclusion would have barred claims by the
3  FDIC in any capacity, rendering the insured versus insured exclusion superfluous.  However, the
4  insured versus insured exclusion is not rendered superfluous merely because there is some
5  overlap in the exclusions covered by the insured versus insured exclusion and a hypothetical
6  regulatory exclusion.  The exclusions are not identical: the regulatory exclusion would bar claims
7  by the FDIC in any capacity whereas the insured versus insured exclusion only bars claims by
8  the FDIC in its capacity as a receiver.  The FDIC's argument would have traction if the
9  regulatory exclusion had no effect or meaning beyond that which is already excluded by the
10  insured versus insured exclusion because the Court must interpret the EPL Policy to give some
11  meaning to all its terms.  See Cal. Civ. Code § 1641.  However, since the regulatory exclusion
12  has some effect beyond that which is provided by the insured versus insured exclusion, namely,
13  the exclusion of claims by the FDIC in its corporate capacity, the regulatory exclusion is not
14  superfluous and the Court does give some meaning to all the EPL Policy's terms under
15  BancInsure's proposed interpretation.  See Mt. Hawley Ins. Co., 695 F. Supp. at 483 ("...even
16  though the regulatory endorsement was omitted, Endorsement 3's [the insured versus insured
17  endorsement] exclusion of coverage for suits by CSB *also operates* to exclude coverage for this
18  suit brought by the FSLIC as receiver for CSB.") (italics added).

19       Based upon the foregoing, the Court finds that the existence of a separate regulatory
20  exclusion does not suggest that the insured versus insured exclusion was not intended to apply to
21  claims brought by the FDIC in its capacity as a receiver of a failed bank.  This extrinsic evidence
22  does not render the EPL Policy reasonably susceptible to the interpretation urged by the FDIC.

23       3.    The Parties' Reasonable Expectation

24       The FDIC also argues that the reasonable expectation regarding the insured versus
25  insured exclusion was to prevent collusive lawsuits brought by one insured against another.
26  Such exclusions

27         arose ... as a reaction to several lawsuits in the mid-1980s in which
           insured corporations sued their own directors to recoup operational
28         losses caused by improvident or unauthorized actions.  [Footnote

10

> omitted.]   Such lawsuits created problems of moral hazard, collusion, and unintended expansion of coverage.  The reasonable expectations of the parties were that they were protecting against claims by outsiders, not intracompany claims.

Biltmore Associates, LLC v. Twin City Fire Ins. Co., 572 F.3d 663, 668 (9th Cir. 2009).  With this intent in mind, the FDIC argues, it does not make sense to preclude coverage for claims brought by the FDIC as a receiver because such claims "clearly are not collusive."  (FDIC MPA 17:4-7.)

As an initial matter, the FDIC's argument is flawed because it would apply to any type of receiver in any context.  The term "receiver" exists in Exclusion 21 and the EPL Policy must be interpreted to give *some* meaning to all its terms, Cal. Civ. Code § 1641, whether "receiver" be interpreted to mean all receivers as proposed by BancInsure, or only certain types of court appointed receivers as proposed by the FDIC.  The FDIC argues that the intent of the insured versus insured exclusion does not apply to claims by the FDIC-as-receiver because they are "clearly not collusive," yet that rationale would apply to any type of receiver, including court appointed receivers.  Thus, the FDIC's proposed intent of Exclusion 21 does not explain why Exclusion 21 would apply to some receivers but not the FDIC.

Moreover, FDIC-as-receiver claims have the potential of sharing some of the characteristics of the typical insured versus insured claim.  Much like a corporation suing its own directors and officers for operational losses caused by improvident actions, the FDIC in its capacity as a receiver steps into the shoes of a failed bank and, in this case, seeks to recoup operational losses caused by improvident actions.  Thus, the character of suit is similar.

Further, a suit by the FDIC against a failed bank's directors and officers has potential for collusion just as a suit by a corporation against its own directors and officers.  While the Court is not accusing the FDIC of collusion in this instance, hypothetically speaking, the interests of the FDIC-as-receiver could be aligned with the interests of the directors and officers of a failed bank when an insurer is involved.  Insurance proceeds paid out on a claim brought by the FDIC would be used to pay off the failed bank's creditors, which may include the same directors and officers that were defending the lawsuit.  Accordingly, it is not difficult to imagine a scenario involving

1   collusion between the FDIC and the directors and officers whereby the directors and officers

2   allow judgment to be entered against them so that the insurer is forced to pay the judgment.  In

3   such a scenario, the directors and officers benefit by having their uninsured investment and loans

4   paid from the insurance proceeds.

5       Accordingly, the Court rejects the FDIC's argument that excluding the FDIC's claims

6   would be inconsistent with the parties' reasonable expectations that the insured versus insured

7   exclusion was intended to prevent collusive lawsuits.  Rather, the Court finds that BancInsure's

8   argument is more likely to represent the parties' reasonable expectations regarding Exclusion 21.

9   At the hearing, BancInsure argued that the intent of Exclusion 21 was to effectuate the

10  company's desire not to cover any claims by any type of entity that succeeds, takes over, or

11  otherwise steps into the shoes of the insured.  In BancInsure's words, such entities should be

12  given "equal dignities" and should not enjoy "superior rights" with respect to their predecessors.

13  Thus, the term "receiver" was included in Exclusion 21 to put any type of receiver on the same

14  footing as an insured, a successor, assignee, etc.  Accordingly, the Court rejects the FDIC's

15  proposed interpretation, which would differentiate and discriminate against court-appointed

16  receivers as opposed to the FDIC as a receiver for no rational reason.

17      4.   Prior Cases Interpreting Insured Versus Insured Exclusions

18      The FDIC cites a number of cases where courts have held that insured versus insured

19  exclusions do not apply to the FDIC.  See American Cas. Co. of Reading, Pennsylvania v. Sentry

20  Federal Sav. Bank, 867 F. Supp. 50 (D. Mass. 1994); American Cas. Co. v. FDIC, 791 F. Supp.

21  276 (W.D. Okla. 1992); FDIC v. American Cas. Co. of Reading, Pennsylvania, 814 F. Supp.

22  1021 (D. Wyo. 1991); St. Paul Fire and Marine Ins. Co. v. Federal Deposit Ins. Corp., 765 F.

23  Supp. 538 (D. Minn. 1991).

24      However, the cases cited by the FDIC are distinguishable from the facts of this case

25  because Exclusion 21 of the EPL Policy is materially different from the insured versus insured

26  exclusions interpreted in the cases cited by the FDIC.  Exclusion 21 specifically excludes claims

27  brought by "receivers."  The insured versus insured exclusions in the cases cited by the FDIC did

28  not include language expressly excluding claims brought by "receivers."

1   This distinction is significant.   In <u>American Casualty Co. of Reading, Pa. v. Federal</u>

2   <u>Savings & Loan Insurance Corp.</u>, 704 F. Supp. 898, 901 (E.D.Ark.1989), the Court found that

3   the insured versus insured exclusion was ambiguous and construed the clause in favor of the

4   insured in part because there was no "reference in the endorsement to successors, assigns,

5   trustees or receivers."   Thus, this case presents the precise scenario contemplated by <u>American</u>

6   <u>Casualty Co. of Reading, Pa. v. Federal Savings & Loan Insurance Corp.</u>: the EPL Policy in this

7   case *does* expressly exclude coverage for claims brought by "receivers."   Accordingly, the cases

8   cited by the FDIC are not persuasive with respect to the issue of whether the term "receiver," as

9   it is used in Exclusion 21 of the EPL Policy, applies to claims brought by the FDIC in its

10   capacity as a receiver.

11       5.   <u>Other Extrinsic Evidence</u>

12       The FDIC relies on other extrinsic evidence as demonstrating the mutual intent between

13   BancInsure and County Bank regarding the proper interpretation of Exclusion 21.   The FDIC

14   points to e-mails sent from BancInsure in support of its interpretation that Exclusion 21 does not

15   apply to the claims brought by the FDIC in the Civil Action.

16       First, the FDIC cites an e-mail exchange between Don Pratt and Barbara Ewing on or

17   around March 3, 2008.

18       Ms. Ewing asked Mr. Pratt the following question:

19       In that case, I think we specifically want the insured vs insured
20       exclusion to preclude coverage for claims made by trustees, etc.
         since we specifically list them in the exclusion. . .
         Question, do you think the wording of that exclusion would
21       preclude coverage for claims made by the FDIC or other banking
         regulator[sic] after they have taken over the bank?  Or would those
22       be claims made as a regulator and not a receiver???

23   (Decl. of James H. Vorhis in Supp. of the FDIC as Receiver for County Bank's Opp'n to Mot.

24   for Summ. Adj. ("Vorhis Decl."), Ex. L, at pg. 1, ECF No. 100.3.)

25       Mr. Pratt responded:

26       The FDIC would bring claim[sic] under both capacities, as the
27       bank regulator and as the receiver.  I would assume the intention of
         BancInsure is to afford insurance coverage for bank regulator
         claims since such do not have the same character as potentially
28       being collusive and would have been brought within coverage by

13

the D & O's Regulatory Exclusion Endorsement.  The case decision trends were to oftentimes interpret a basic insured vs. insured exclusion to unambiguously bar coverage for an FDIC action in its capacity as an insured bank's receiver.

(Vorhis Decl., Ex. L, at pg. 1, ECF No. 100.3.)

This e-mail exchange supports BancInsure's interpretation of Exclusion 21.  Mr. Pratt takes the position that the insured versus insured exclusion would not bar claims by the FDIC in its corporate capacity, but that "case decision trends" would interpret Exclusion 21 as barring claims brought by the FDIC in its capacity as a receiver.

The FDIC also cites an e-mail exchange between Richard Holmes and Barbara Ewing on or around March 1, 2008.  Kathy Wohlford raised the following "issue" pertaining to the insured versus insured exclusion:

> 1.      The first issue relates to what happens if the company ends up in a bankruptcy or receivership and the trustee or the receiver files a claim against the officers and directors.  These claims are analogous to shareholder derivative lawsuits and although technically brought in the name of or on behalf of the company are really third party claims in practice.  However they do implicate the insured vs. insured exclusions in insurance contracts.  Basically, the insured vs. insured clauses preclude coverage when the claim is brought by an insider.
> The case law on whether these claims are excluded by standard insured vs. insured clauses are mixed.  [...]
> Your policy's insured vs. insured provision is set forth in Section V(11).  The exclusion has a carve out for shareholder derivative claims but not for bankruptcy or receiver claims, and on its face would clearly preclude coverage for claims brought by receivers or bankruptcy trustees.  This is a negotiable item, however, and insurers will often agree to give you coverage for these sorts of third party "insider" claims if you ask.  I recommend seeking an endorsement to the policy to cover these sorts of claims.

(Vorhis Decl., Ex. K, at pg. 2, ECF No. 100.3.)  In an internal BancInsure e-mail sent from Ms. Ewing to Mr. Holmes, Ms. Ewing wrote "Regarding issue 1, banks are taken over by regulators. They do not go into bankruptcy, so it is not really an issue for banks."  (Vorhis Decl., Ex. K, at pg. 1, ECF No. 100.3.)  However, it does not appear that this response was forwarded to Ms. Wohlford.  On March 3, 2008, Mr. Holmes sent Ms. Ewing an e-mail reminding her that "...the banker is waiting for our official response to those items I send[sic] you earlier."  (Vorhis Decl., Ex. M, at pg. 1, ECF No. 100.3.)  Ms. Ewing then stated:

14

1  You may respond to the banker as follows:
"If there is a holding company, then it can be put in bankruptcy
2  and have a receiver.  However, the insured vs. insured exclusion in
the Extended Professional Liability policy specifically excludes
3  claims made by a receiver and we are not willing to change that
wording.  The policy should not become a vehicle for the receiver
4  to get funds for the corporation."

5  (Vorhis Decl., Ex. M, at pg. 1, ECF No. 100.3.)

6      These e-mail exchanges do not support the interpretation urged by the FDIC.  As an

7  initial matter, the Court notes that the e-mail from Ms. Wohlford demonstrates that County Bank

8  interpreted Exclusion 21 as excluding claims brought by the FDIC in its receiver role and asked

9  BancInsure to include an endorsement "to cover these sorts of claims."  (Vorhis Decl., Ex. K, at

10  pg. 2, ECF No. 100.3.)  Thus, the e-mail exchange does not establish a *mutual* misunderstanding

11  regarding Exclusion 21, it shows that, at that time, County Bank believed that Exclusion 21

12  would operate to bar claims by the FDIC in its capacity as a receiver and sought an

13  "endorsement to the policy to cover these sorts of claims."  Accordingly, Ms. Wohlford's e-mail

14  strongly supports BancInsure's interpretation of the EPL Policy because it shows that County

15  Bank believed that an additional endorsement was necessary to modify the insured versus

16  insured exclusion so that FDIC-as-receiver claims would be covered by the EPL Policy.

17      Further, Ms. Ewing's internal e-mail to her colleagues states that "issue 1" "is not really

18  an issue for banks" because banks "do not go into bankruptcy."  (Vorhis Decl., Ex. K, at pg. 1,

19  ECF No. 100.3.)  This does not support the FDIC's interpretation that Exclusion 21 does not

20  apply to FDIC-as-receiver claims.  Instead, Ms. Ewing appears to have interpreted "issue 1" as

21  asking about the implications of bankruptcy, which is confirmed by her follow-up e-mail where

22  she acknowledges the possibility of County Bank's holding corporation, Capital Corp., going

23  into bankruptcy and that the insured versus insured exclusion would bar claims brought by the

24  bankruptcy trustee.  Again, this response does not appear to speak at all about the implication of

25  claims brought by the FDIC in its capacity as a receiver for County Bank.

26      The FDIC also points to the deposition of testimony of James Cross, who was deposed as

27  the BancInsure's person most knowledgeable regarding topics such as directors and officers

28  policies and extended professional liability policies.  (Decl. of Patrick J. Richard in Supp. of the

1  FDIC as Receiver for County Bank's Opp'n to Mot. for Summ. Adj. ("Richard Decl.") Ex. A, at

2  pg. 3, ECF No. 98.1.)  Mr. Cross testified that claims brought by the FDIC in its capacity as a

3  receiver would be classified as a "regulatory claim."  (Decl. of Patrick J. Richard in Supp. of the

4  FDIC as Receiver for County Bank's Opp'n to Mot. for Summ. Adj. ("Richard Decl.") Ex. A, at

5  pp. 7, 19, 22, 24-25, 41, ECF No. 98.1.)  However, as discussed above, the regulatory exclusion

6  would have excluded claims by the FDIC in *all* capacities, including its capacity as a receiver.

7  Accordingly, BancInsure's classification of FDIC-as-receiver claims as "regulatory claims" does

8  not provide insight as to whether such claims would also be barred by the insured versus insured

9  exclusion.

10       Mr. Cross further testified as follows:

11           Q.    Okay.  Would banks assume that regulatory claims would
             be barred by the regulatory exclusion?
12           A.    Yes.
             Q.    Wouldn't banks assume that if the regulatory exclusion was
13           removed, then they'd have coverage for the claims that would have
             otherwise been barred?
14           ...
             A.    I believe they would have thought regulatory claims would
15           have been covered.
             Q.    You think they would have though regulatory claims would
16           be covered?
             A.    I can't speculate on what they would have thought, but they
17           probably certainly thought some regulatory claims would have
             been covered.
18

19  (Decl. of Patrick J. Richard in Supp. of the FDIC as Receiver for County Bank's Opp'n to Mot.

20  for Summ. Adj. ("Richard Decl.") Ex. A, at pg. 42-43, ECF No. 98.1.)

21       Mr. Cross' testimony does not support the FDIC's argument.  Mr. Cross' testimony is

22  consistent with the interpretation that the regulatory exclusion barred FDIC claims in all

23  capacities and the insured versus insured exclusion only barred FDIC claims in its capacity as a

24  receiver: an insured may have thought *some* regulatory claims (e.g., regulatory claims by the

25  FDIC in its corporate capacity) would be covered if the regulatory exclusion were removed from

26  the insurance policy.  Moreover, the question posed to Mr. Cross by the FDIC's attorney is an

27  incomplete hypothetical.  Mr. Cross was not asked whether an insured would have thought all

28  regulatory claims would have been covered if the regulatory exclusion was removed *and* the

1   insured versus insured exclusion was in place.   In other words, the question posed was

2   ambiguous as to whether the effect of an insured versus insured clause was considered by Mr.

3   Cross in his initial response.

4         The FDIC also relies on an initial reinsurance report whereby a BancInsure claims

5   manager noted that "[t]here is no regulatory claim exclusion contained in the Extended

6   Professional Liability Policy" but is silent with respect to the insured versus insured exclusion.

7   (Richard Decl. Ex. D, at pg. 4, ECF No. 98.1.)   However, the Court does not view the claims

8   manager's failure to mention the insured versus insured exclusion as substantial evidence in

9   favor of the FDIC's interpretation that the exclusion did not apply.

10        The FDIC cites statements from BancInsure employees advertising the EPL Policy as

11  having "broader coverage."   (Vorhis Decl. Ex. I, at pg. 1, ECF No. 100.3; Richard Decl. Ex. K,

12  at pg. 2, ECF No. 98.2.)   However, the FDIC presented no foundation or context for these

13  statements and it is unclear what is being compared to the new EPL Policy.   To the extent that

14  the policy is being compared to the prior D&O policy that included the regulatory exclusion, the

15  EPL Policy would be considered broader since it allowed claims by the FDIC in its corporate

16  capacity.

17        Finally, the FDIC relies on discovery responses provided by BancInsure in <u>Columbian</u>

18  <u>Bank Financial Corp. v. BancInsure</u>, Case No. 08-cv-2642, in the District of Kansas.   These

19  discovery responses merely state that claims by the FDIC as a receiver would be barred by the

20  regulatory exclusion and do not speak to whether those same claims would be barred by an

21  insured versus insured exclusion.   It is unclear whether an insured versus insured exclusion,

22  identical in wording to the EPL Policy, was in effect in the insurance policy at issue in that case.

23        Based upon the foregoing, the Court finds that the FDIC's extrinsic evidence does not

24  render Exclusion 21 "reasonably susceptible" to the interpretation urged by the FDIC.

25        6.    <u>Safeco Insurance Company of America v. Robert S and American Alternative</u>
             <u>Insurance Corp. v. Superior Court</u>

26

27        The FDIC cites <u>Safeco Insurance Company of America v. Robert S</u>, 26 Cal. 4th 758

28  (2001) and <u>American Alternative Insurance Corp. v. Superior Court</u>, 135 Cal. App. 4th 1239

1   (2006) in support of its position that the EPL Policy should be interpreted to cover claims

2   brought by the FIDC in its capacity as a receiver.

3          The FDIC cites <u>Safeco</u> for the proposition that this Court should not insert into the

4   insurance policies additional provisions which were omitted by the parties.  However, this is not

5   a case of the Court inserting an exclusion that had been omitted by the parties.   While the

6   regulatory exclusion was omitted from the EPL Policy, the insured versus insured exclusion is in

7   the policy.  The exclusion of claims by "receivers" is not a term being inserted into the policy by

8   the Court.  Accordingly, <u>Safeco</u>'s reasoning does not apply.

9          The FDIC cites <u>American Alternative</u> for the proposition that the availability of specific

10  exclusions can inform the Court's interpretation of an insurance policy.    In <u>American</u>

11  <u>Alternative</u>, the insurance policy at issue covered a private airplane owned by the insured.

12  <u>American Alternative Ins. Corp.</u>, 135 Cal. App. 4th at 1242.  The policy provided coverage for

13  physical damage to the aircraft.  The original policy included an exclusion for physical damage

14  caused by governmental seizures.   However, the insured purchased an endorsement which

15  eliminated this exclusion.  The court reasoned that, taking into consideration the availability and

16  elimination of this exclusion, the policy without the exclusion would be interpreted to cover

17  physical damage from governmental seizures.

18         However, the facts in this case are distinguishable from the facts in <u>American</u>

19  <u>Alternative</u>.  First, this is not a scenario where the regulatory exclusion existed in the EPL Policy

20  and County Bank purchased an endorsement to remove the exclusion.  Instead, the regulatory

21  exclusion was removed as a matter of course by BancInsure in order to remain competitive in the

22  insurance market.  Secondly, the rationale in <u>American Alternative</u> appears to be premised on the

23  fact that the governmental seizure exclusion would have been mere surplussage if the underlying

24  policy did not cover damage from governmental seizures in the first place.  As discussed above,

25  this is not the case with the regulatory exclusion, because even if the insured versus insured

26  exclusion is interpreted to exclude claims by the FDIC in its capacity as a receiver, the regulatory

27  exclusion would still have significance because it would further exclude claims by the FDIC in

28  its corporate capacity.  Accordingly, <u>American Alternative</u>'s reasoning does not apply in this

1  case.

2        7.    The FDIC Acts as a "Receiver" Within the Meaning of Exclusion 21

3        Based upon the foregoing, the Court finds that, in the context of the Civil Action, the

4  FDIC's claims as receiver for County Bank falls within the meaning of "receiver" as the term is

5  used in Exclusion 21 of the EPL Policy.[1]  Accordingly, the FDIC's claims against the County

6  Bank Officers in the Civil Action are excluded from coverage under the EPL Policy.

7        **B.**      **BancInsure's Objections to the FDIC's Evidence**

8        BancInsure filed objections to the FDIC's evidence and filed a motion to strike certain

9  evidence from the record.  (ECF No. 101.)  BancInsure contends that such evidence has not been

10  properly authenticated and is immaterial.  Moreover, at the hearing, the parties disputed at length

11  over whether California law permits the Court to consider extrinsic evidence for the purpose of

12  making an initial determination of whether an ambiguity exists in the EPL Policy.

13        The Court need not resolve the conflict between the parties.  The Court has provisionally

14  considered all of the evidence presented by the FDIC.  Even if all the evidence was properly

15  authenticated and admissible, the EPL Policy is not "reasonably susceptible" to the interpretation

16  urged by the FDIC.  See Hervey v. Mercury Cas. Co., 185 Cal. App. 4th 954, 961-62 (2010).

17  Exception 21 is not "reasonably susceptible" to an interpretation whereby the term "receiver"

18  someone makes a distinction between the FDIC as a receiver and other types of receivers.

19  Accordingly, the Court need not consider BancInsure's separate objections to the evidence and

20  BancInsure's motion to strike such evidence will be denied as moot.

21  / / /

22  / / /

23  / / /

24  / / /

---

28  [1] Since the Court finds that the FDIC is a "receiver" within the meaning of Exclusion 21, the Court need not address the parties arguments pertaining to whether the FDIC is a "successor" within the meaning of Exclusion 21.

**C.      The FDIC's Arguments Pertaining to "Loss"**

The FDIC's motion for summary judgment raises arguments pertaining to the definition of "loss" within the meaning of the EPL Policy.  However, BancInsure correctly notes that under the Court's scheduling order, Phase I motions were limited to addressing the interpretation of Exclusion 21.  Accordingly, the FDIC's arguments pertaining to the interpretation of "loss" are premature and will not be addressed by the Court at this time.

**IV.**

**CONCLUSION AND ORDER**

Based upon the foregoing, the Court finds that Exclusion 21 bars coverage for claims brought by the FDIC in its capacity as a receiver.  Accordingly, the EPL Policy bars coverage for the FDIC's claims against the County Bank Officers raised in the Civil Action.   Summary judgment in favor of BancInsure is appropriate with respect to the FDIC's second claim for relief for breach of contract.

Accordingly, it is HEREBY ORDERED that:

1.      BancInsure's motion for summary judgment is GRANTED (ECF No. 74);

2.      The FDIC's motion for summary judgment is DENIED (ECF No. 76);

3.      BancInsure's motion to strike evidence from the record is DENIED as moot (ECF Nos. 104, 105); and

4.      Summary JUDGMENT is granted in favor of BancInsure and against the FDIC with respect to the FDIC's second claim for relief for breach of contract.

IT IS SO ORDERED.

Dated:   __**April 7, 2014**__

_____
UNITED STATES MAGISTRATE JUDGE